FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jan 16, 2018

SEAN F. McAVOY, CLERK

1

2

3 UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

4

5 BARBARA DAVIS, as Personal
Representative of the Estate of G.B.,
deceased,

6
                              Plaintiff,
7
        v.
8

9 WASHINGTON STATE
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES; JENNIFER
10 STRUS, individually and in her official
capacity acting under the color of state
11 law; HEIDI KAAS, individually and in
her official capacity acting under the
12 color of state law; MELISSA
KEHMEIER, individually and in her
13 official capacity acting under the color
of state law; JAMES DESMOND,
14 individually and in his official capacity
acting under the color of state law;
15 CASSIE ANDERSON, individually and
in her official capacity acting under the
16 color of state law; BRINA
CARRIGAN, individually and in her
17 official capacity acting under the color
of state law; MAGGIE STEWART,
18 individually and in her official capacity
acting under the color of state law;
19 LORI BLAKE, individually and in her
official capacity acting under the color
20 of state law; SHANNON SULLIVAN,
individually and in her official capacity

No.   2:17-CV-00062-SMJ

**ORDER RE RIVERSIDE
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

ORDER RE RIVERSIDE DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT- 1

1   acting under the color of state law;
SUSAN STEINER, individually and in
2   her official capacity acting under the
color of state law; CAMERON
3   NORTON, individually and in his
official capacity acting under the color
4   of state law; SARAH OASE,
individually and in her official capacity
5   acting under the color of state law;
RANA PULLOM, individually and in
6   her official capacity acting under the
color of state law; DONALD
7   WILLIAMS, individually and in his
official capacity under the color of state
8   law; CHRIS MEJIA, individually and in
his official capacity acting under the
9   color of state law; RIVERSIDE
SCHOOL DISTRICT NO. 416, a
10   Municipal corporation duly organized
and existing under the laws of
11   Washington State; JUANITA
MURRAY, individually and in her
12   official capacity acting under the color
of state law; ROBERTA KRAMER,
13   individually and in her official capacity
acting under the color of state law;
14   SARAH RAMSDEN, individually and
in her official capacity acting under the
15   color of state law; CAROLINE
RAYMOND, individually and in her
16   official capacity acting under the color
of state law; CHERI MCQUESTEN,
17   individually and in her official capacity
acting under the color of state law;
18   SARAH RAMSEY, individually and in
her official capacity acting under the
19   color of state law; TAMI BOONE,
individually and in her official capacity
20   acting under the color of state law;
MELISSA REED, individually and in

ORDER RE RIVERSIDE DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT- 2

1 her official capacity acting under the color of state law; ANN STOPAR, individually and in her official capacity acting under the color of state law;
2
3 KRISTINA GRIFFITH, individually and in her official capacity acting under the color of state law; WENDY
4 SUPANCHICK, individually and in her official capacity acting under the color of state law; SHERRY DORNQUAST,
5 individually and in her official capacity acting under the color of state law;
6 GARY VANDERHOLM, individually and in his official capacity acting under the color of state law; ROGER PRATT,
7 individually and in his official capacity acting under the color of state law;
8 CHRIS NIEUWENHUIS, individually and in his official capacity acting under the color of state law and JOHN DOES
9 1-50, individually and in their official capacities acting under the color of state law,
10
11
12
13                                    Defendants.

## I.    INTRODUCTION

In August 2014, after five-year-old G.B.'s father was murdered and his mother died of an apparent drug overdose, the Washington Department of Social and Health Services (DSHS) placed G.B. in the care of his aunt, Cynthia Khaleel. G.B. attended Chatteroy Elementary School for the 2014–15 school year. Over the course of that year, G.B exhibited numerous signs of abuse and neglect, including bruising and scratches on his face and head, burns, aggressive and aberrant behavior,

and excessive absence. On April 16, 2015, G.B. told two teachers "my mom punched me in the head." School staff did not immediately report this incident to DSHS or law enforcement. That night, G.B. was beaten to death.

Plaintiff Barbara Davis (Plaintiff), G.B.'s grandmother and representative of his estate, filed this action against DSHS and the Riverside School District, as well as numerous employees of those organizations, alleging a number of state and federal claims. This order addresses the Riverside Defendants'[1] motions for summary judgment on Plaintiff's 42 U.S.C. § 1983 claims against (1) Riverside School District Directors Chris Nieuwenhuis, Roger Pratt, and Gary Vanderholm (the Directors),[2] ECF No. 105; (2) Superintendent Roberta Kramer and Chatteroy Elementary School Principal Juanita Murray, ECF No. 151; and (3) the Riverside School District (the District), ECF No. 157.[3]

---

[1] The "Riverside Defendants" refers to Defendants Riverside School District No. 416, Juanita Murry, Roberta Kramer, Chris Nieuwenhuis, Roger Pratt, Gary Vanderholm, Wendy Supanchick, Kristina Griffith, Ann Stopar, Melissa Reed, Tami Boone, Cheri McQuesten, Caroline Raymond, and Sara Ramsden.

[2] The Directors' motion nominally seeks dismissal of "all claims," ECF No. 105 at 2, but their argument addresses only § 1983 liability and their reply brief requests that the Court dismiss only the § 1983 claims against the Directors, ECF No. 140. Accordingly, the Court does not addressing whether summary judgment is appropriate on Plaintiff's state-law claims against the Directors, and denies the Directors' motion as to the state-law claims.

[3] The Riverside Defendants also seek to strike several declarations submitted by Plaintiff. For the reasons discussed in section IV.E. of this order, these motions lack merit and are denied.

42 U.S.C. § 1983 creates a cause of action against those who, acting pursuant to state government authority, violate federal law. To establish § 1983 liability, a plaintiff must show (1) deprivation of a right secured by the Constitution and laws of the United States and (2) that the deprivation was committed by a person acting under color of state law. *Chudacoff v. Univ. Med. Cntr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011). Plaintiff's underlying theory of § 1983 liability against each of the defendants at issue in these motions relies on application of the state-created-danger exception to the general rule that government actors have no duty to protect individuals from harm caused by a third party. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196–97 (1989). The state-created-danger exception applies only where there is (1) "'affirmative conduct on the part of the state in placing the plaintiff in danger,'" and (2) "the state acts with 'deliberate indifference' to a 'known or obvious danger.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

The Court previously concluded Plaintiff's allegations that child-abuse and neglect policies and practices in place at Chatteroy Elementary School permitted and encouraged staff to report suspected abuse only to specified school officials and to delay reporting to DSHS or law enforcement, accepted as true, demonstrate affirmative conduct placing G.B. in danger and deliberate indifference to a known

or obvious danger. ECF No. 99 at 10–13. Accordingly, the principal question underlying each of the motions now before the Court is whether, viewing the facts in the record in the light most favorable to Plaintiff, a reasonable trier of fact could conclude that child-abuse reporting policy or practice in place at Chatteroy Elementary School affirmatively placed G.B. in danger and constituted deliberate indifference to a known or obvious danger. The answer to that question is yes. On the record before the Court, material factual questions remain concerning (1) the nature of the child-abuse reporting practices employed at Chatteroy Elementary School, including whether staff were required to report suspected abuse only to designated staff or administrators and whether staff were encouraged to delay or avoid reporting suspected abuse; (2) whether such practices affirmatively placed G.B. in danger; and (3) whether adopting and implementing such practices amounted to deliberate indifference.

Because the Directors' only role was adopting the district-wide child abuse, neglect, and exploitation policies and practices, which required immediate reporting of suspected abuse, and they had no direct supervisory obligations relating to the implementation of those policies and practices by district staff at individual schools, Plaintiff's § 1983 claims against the Directors must be dismissed. Murray and Kramer, by contrast were directly involved with implementing the abuse-reporting practices at Chatteroy Elementary School and they are not immune from liability.

Issues of fact therefore preclude summary judgment on the § 1983 claims against Murray and Kramer. Additionally, because the alleged harm here was caused by District policy, practice, or custom, or by final policy makers, the District is a proper § 1983 defendant.

## II.    BACKGROUND

### A.    G.B.'s family history and time at Chattaroy Elementary School

G.B. was born in Port Angeles, Washington in October 2009. ECF No. 1 at 12. G.B.'s father was murdered in his home in June 2012, and his mother died of an apparently drug-related heart attack two years later, in July 2014. *Id.* at 12–13. Following the death of his mother, G.B. and his siblings became dependents of the State of Washington. *Id.* at 13. In August, 2014, G.B. and his younger brother were placed in the care of their paternal aunt, Cynthia Khaleel near Spokane, Washington. *Id.* at 13.

In fall 2014 G.B. began attending Chatteroy Elementary School in the Riverside School District, where he was enrolled in the Early Childhood and Education Assistance (ECEAP) pre-school program. *Id.* at 13; ECF No. 171-3 at 3–4. Because of developmental disabilities, G.B. also participated in an Individualized Educational Program (IEP). ECF No. 1 at 13; ECF No. 171-3 at 7. G.B. had serious difficulties with aggression, self-control, and communication, ECF No. 171-3 at 14–15; ECF No. 171-12, although staff at Chatteroy Elementary indicated that he made

progress on these issues during his time there. ECF No. 171-3 at 14–15, ECF No. 171-4 at 6–7; ECF No. 171-12. He also made continual academic progress. ECF No. 171-12 at 5–6, 15–16. G.B. reportedly enjoyed coming to school. ECF No. 171-4 at 16.

Numerous school staff had contact with G.B. through ECEAP, IEP, and other school services. Sheri Dornquast was the lead teacher in the G.B's ECEAP classroom during that school year, and Chatteroy Principal Juanita Murray was the ECEAP director. ECF No. 171-3 at 3–4. Ann Stopar and Carolyn Raymond were assistant lead teachers in G.B.'s ECEAP classroom. ECF No. 171-3 at 7; ECF No. 171-6. Christina Griffith was an IEP teacher and Melissa Reed was an IEP aid at Chatteroy who worked with G.B. ECF No. 171-3 at 7. Sara Ramsden was a speech pathologist who worked with children in ECEAP, including G.B. ECF No. 171-4 at 4. Carolyn Raymond was a psychologist who worked with ECEAP students, including G.B. ECF No. 171-3 at 8. Wendy Supanchick was the school nurse, and examined G.B. on at least one occasion. *Id.* at 8. Tami Boon and Cheri McQuesten were family service coordinators. ECF No. 171-5 at 5; 171-7 at 5. A number of other specialists also worked G.B. during the course of the school year. ECF No. 171-3 at 8.

During the 2014–15 school year, staff and teachers at Chatteroy Elementary School observed numerous signs that G.B. may have been suffering abuse and

neglect:

- In early October 2014, Sheri Dornquast noticed bruising on G.B.'s forehead. ECF No. 171-3 at 20–21, 27. She took a photograph and called Murray into the ECEAP classroom to look at the bruising. ECF No. 171-1 at 18–20; ECF No. 171-3 at 20. Dornquast discussed G.B.'s injuries with several other staff members, some of whom also saw G.B. and observed the bruises. ECF No. 171-3 at 27. Murray decided not to contact DSHS and denies suspecting that the bruises were signs of abuse. ECF No. 171-1 at 19.

- Later in October, at a pumpkin-patch field trip, Dornquast noticed G.B. had a bandage covering his entire forehead. ECF No. 171-3 at 20, 27. She asked Khaleel about the bandage, and Khaleel stated that G.B. had gotten a very bad sunburn. *Id.* at 20. Later, when Dornquast saw G.B. without the bandage, she observed a pink mark and peeling skin consistent with a burn. *Id.* at 28. Ramsden, Boon, Stopar, and McQuesten also remembered seeing a burn or red inflamed area on G.B.'s forehead around that time. ECF No. 171-4 at 13; ECF No. 171-5 at 12; ECF No. 171-6 at 6; ECF No. 171-7 at 12, 18. Dornquast told them that Khaleel had told her it was a sunburn. ECF No. 171-4 at 13; ECF No. 171-6 at 6. A photograph taken shortly after that incident showed G.B. with scabs on his forehead. ECF No. 171-3 at 29; ECF No. 171-13.

- On November 20, 2014, Dornquast noticed bruising on G.B.'s ears and arm. ECF No. 171-3 at 21, 32. Dornquast again contacted Murray about G.B.'s injuries. ECF No. 171-1 at 21; ECF No. 171-3 at 22. Dornquast asked Murray if she should report the incident, and Murray told her she would take care of it. ECF No. 171-3 at 22, 32. Murray asked the school nurse, Wendy Supanchick, examine G.B. ECF No. 171-1 at 21. No report was made to DSHS concerning this incident. *Id.* at 22.

- Dornquast indicated that she had observed G.B. hitting his head against things on several occassions. ECF No. 171-3 at 27.

- At a Christmas concert on December 10, 2014, several staff observed bruising and scratches on G.B.'s face. ECF No. 171-4 at 12, 17. Ramsend stated that she believed these injuries were signs of abuse. G.B. attended school for only four days in December 2014. ECF No. 171-3 at 17–18. at 12. At this same concert, Ramsend observed that G.B. and a sibling were left alone in a stroller outside the school gymnasium. ECF No. 171-4 at 25. This concerned her because both children were "high-needs." *Id.* at 25.

- G.B. had significant absences in December 2014 and January 2015, ECF No. 171-4 at 20, and was absent for all but three school days in March 2015. ECF No. 171-1 at 18.

Only one of these incidents was reported to DSHS. After Ramsend shared her concerns about the injuries G.B. had at the Christmas concert with Caroline Raymond and then Tiffany Zuck, on December 12, 2014, Zuck submitted a report to DSHS indicating that she believed G.B. and his siblings were being abused at home. ECF No. 135-9 at 4. She reported that G.B. had multiple injuries consistent with abuse and that Khaleel did not adequately supervise him. *Id.* at 4. Following this incident, Khaleel came into the school and confronted Zuck, verbally attacking her, yelling profanities, and threatening her. ECF No. 135-15 at 5; ECF No. 171-4 at 9–10.

Riverside Superintendent Kramer had a conversation with Khaleel in which she told Khaleel that she could not discuss CPS reports and asked Khaleel to leave. ECF No. 171-2 at 9. Kramer subsequently instructed Murray to tell Zuck that her interactions were upsetting and disruptive to the family. *Id.* at 10. Consistent with

Khaleel's request not to have further involvement with Zuck, Zuck was instructed not to deal with Khaleel in the future, although Kramer does not recall specifically telling Zuck that she was prohibited from having any contact with the Khaleel family. *Id.* at 10. Zuck asserts that the District and administration told her not to have contact with G.B. or his siblings. ECF No. 135-15 at 5. Zuck also asserts that Murray declined to report complaints about abuse and neglect in the Khaleel home from G.B.'s grandmother, Barbara Davis, because Murray suspected Davis was lying. *Id.* at 5. Murray denies these assertions. ECF No. 171-1 at 28–29.

**B. G.B.'s death**

On the morning of April 16, 2015, G.B. told Melissa Reed that "Mom punched me in the head,"[4] and he gesticulated to indicate a punch to the head. ECF No. 171-3 at 23. Dornquast overheard this statement and asked Reed to confirm what he said, which she did. *Id.* Dornquast asked G.B. what he had said, and he repeated "punched me in the head." *Id.* Dornquast denies seeing any evidence of injury or that G.B. reported he was in any pain. *Id.* Dornquast did not believe G.B. that Khaleel "punched" him, but thought she might have "popped, you know, flicked him [or] something." *Id.* This incident was not immediately reported to DSHS or law enforcement. *Id.* Murray was not working on that day. ECF No. 171-1 at 24.

---

[4] Murray stated that she was told the statement was "my mommy punched me in the head." ECF No. 171-1 at 25

Dornquast states that she would have reported the incident to Murray if she had not been out of town. ECF No. 171-3 at 23.

On the morning of April 17, 2015, emergency medical providers arrived at the Khaleel residence and discovered G.B. in an unresponsive state. ECF No. 1 at 13. He was taken to Sacred Heart Medical Center, where medical staff discovered multiple skull fractures and traumatic injuries to his brain. *Id.* He died from these injuries the following day. *Id.* at 14. The Spokane County Medical examiner determined that G.B.'s cause of death was blunt force head injury, and ruled the death a homicide. *Id.* G.B. also sustained multiple other traumas, including an abdominal injury that was the result of a forceful blow. *Id.* Khaleel was arrested in July 2015, and charged with second-degree murder. *Id.*

**C.    The Riverside School District's Board of Directors' policymaking authority and process**

The School Board of Directors is the final policymaking authority for the District. ECF No. 149 at 6–7. Adopted policies are "directive[s] to the superintendent to work with her administrators to come up with the procedure." *Id.* The Directors have authority to hire and terminate the superintendent and have sole oversight authority over the superintendent. *Id.* at 7. But the Directors do not engage in administrative supervision of district operations or policy implementation. ECF No. 143 at 9.

The Washington State School Directors Association (WSSDA) provides

policy services to member districts. ECF No. 149 at 4–5. These services include reviewing legislative enactments and Washington Administrative Code (WAC) updates and providing notifications and guidance to school districts on policy and procedure implications of changes in the law. *Id.* The WSSDA also provides model policies and procedures to all member districts. *Id.* at 4. Nearly all Washington School Districts subscribe to WSSDA's services, including the Riverside School District. *Id.* at 5–6. The Riverside School District's practice is to promptly adopt WSSDA model policies without change. *Id.* at 6.

**D.    District-wide child abuse, neglect, and exploitation policy**

The District adopted the WSSDA's model child abuse, neglect and exploitation policy and procedures without change as Policy No. 3421 and Procedure No. 3421P in December 2013. ECF No. 109 at 2; ECF No. 149 at 6. These policies were in effect during the 2014–15 school year. ECF No. 149 at 6.

Policy No. 3421 provides:

Child abuse, neglect and exploitation are violations of children's human rights and an obstacle to their educational development. The board directs that staff will be alert for any evidence of such abuse, neglect or exploitation. For purposes of this policy, "child abuse, neglect or exploitation" will mean:

A.    Inflicting physical injury on a child by other than accidental means, causing death, disfigurement, skin bruising, impairment of physical or emotional health, or loss or impairment of any bodily function;

B.   Creating a substantial risk of physical harm to a child's bodily functioning;

C.   Committing or allowing to be committed any sexual offense against a child as defined in the criminal code, or intentionally touching, either directly or through the clothing, the genitals, anus or breasts of a child for other than hygiene, child care or health care purposes;

D.   Committing acts which are cruel or inhumane regardless of observable injury. Such acts may include, but are not limited to, instances of extreme discipline demonstrating a disregard of a child's pain or mental suffering;

E.   Assaulting or criminally mistreating a child as defined by the criminal code:

F.   Failing to provide food, shelter, clothing, supervision or health care necessary to a child's health or safety;

G.   Engaging in actions or omissions resulting in injury to, or creating a substantial risk to the physical or mental health or development of a child; or

H.   Failing to take reasonable steps to prevent the occurrence of the preceding actions.

Child abuse can include abuse by another minor and so may be included in incidents of student misconduct.

When feasible, the district will provide community education programs for prospective parents, foster parents and adoptive parents on parenting skills and on the problems of child abuse and methods to avoid child abuse situations. The district will also encourage staff to participate in in-service programs that deal with the issues surrounding child abuse.

The superintendent will develop reporting procedures, including sample indicators of abuse and neglect, and will disseminate the procedures to all staff. The purpose is to identify and report as soon as possible to the proper authorities all evidence of child abuse or neglect. Staff will receive training regarding reporting obligations during their initial orientation and every three years after initial employment.

Classified and certified staff are legally responsible for reporting all suspected cases of child abuse and neglect. A certified or classified school employee who has knowledge or reasonable cause to believe that a student has been a victim of physical abuse or sexual misconduct by another school employee will report such abuse or misconduct to the appropriate school administrator. The administrator will report to the proper law enforcement agency if he or she has reasonable cause to believe that the misconduct or abuse has occurred as required under RCW 26.44.030. Under state law staff are free from liability for reporting instances of abuse or neglect and professional staff are criminally liable for failure to do so.

Staff need not verify that a child has in fact been abused or neglected. Any conditions or information that may reasonably be related to abuse or neglect should be reported. Legal authorities have the responsibility for investigating each chase and taking such action as is appropriate under the circumstances.

ECF No. 109-1.

Procedure 3421P provides:

Each school principal will develop and implement an instructional program that will teach students:

      A.    How to recognize the factors that may cause people to abuse others;

      B.    How one may protect oneself from incurring abuse; and

      C.    What resources are available to assist an individual

1   who does or may encounter an abuse situation.

2   To facilitate such a program, staff development activities may include
    such topics as:

3

4       1.      Child growth and development;

5       2.      Identification of child abuse and neglect;

6       3.      Effects of child abuse and neglect on child growth
                and development;

7
        4.      Personal safety as it relates to potential child abuse
8               and neglect;

9       5.      Parenting skills;

10      6.      Life situations/stressors which may lead to child
                maltreatment; or

11
        7.      Substance abuse.
12

13
    **Reporting Responsibilities**
14

15  Staff are expected to report every instance of suspected child abuse or
    neglect. Since protection of children is the paramount concern, staff
16  should discuss any suspected evidence with the principal or nurse
    regardless of whether the condition is listed among the indicators of
17  abuse or neglect.

18  Staff are reminded of their obligation as district employees to report
    suspected child abuse, and professional staff are reminded of their legal
19  obligation to make such reports. Staff are also reminded of their
    immunity from potential liability for doing so. The following
20  procedures are to be used in reporting instances of suspected child
    abuse:

ORDER RE RIVERSIDE DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT- 16

A.    When there is reasonable cause to believe that a student has suffered abuse or neglect, staff or the principal will immediately contact the nearest office of the Child Protective Services (CPS) of the Department of Social and Health Services (DSHS). If this agency cannot be reached, the report will be submitted to the police, sheriff, or prosecutor's office. Such contact must be made within forty-eight (48) hours. Staff will also advice the principal regarding instances of suspected abuse or neglect and reports of suspected abuse that have been made to state authorities or law enforcement. In his/her absence the report will be made to the nurse or counselor.

B.    A written report will be submitted promptly to the agency to which the phone report was made. The Report will include:

     1.    The name, address and age of the child;

     2.    The name and address of the parent or person having custody of the child;

     3.    The nature and extent of the suspected abuse or neglect;

     4.    Any evidence of previous abuse or any other information that may relate to the cause or extent of the abuse or neglect;

     5.    The identity, if known, of the person accused of inflicting the abuse.

C.    The district will within forty-eight (48) hours of receiving a report alleging sexual misconduct by a school employee notify the parents of a student

alleged to be the victim, target or recipient of the misconduct.

**Abuse Indicators**

**Physical abuse indicators:**

1. Bilateral bruises, extensive bruises, bruises of different ages, patterns of bruises caused by a particular instrument (belt buckle, wire, straight edge, coat hanger, etc.);

2. Burn patterns consistent with forced immersion in a hot liquid (a distinct boundary line where the burn stops), burn patterns consistent with a spattering by hot liquids, patterns caused by a particular kind of implement (electric iron, etc.) or instrument (circular cigarette burns, etc.);

3. Lacerations, welts, abrasions;

4. Injuries inconsistent with information offered by the child;

5. Injuries inconsistent with child's age; or

6. Injuries that regularly appear after absence or vacation.

**Emotional Abuse indicators**

1. Lags in physical development;

2. Extreme behavior disorder;

3. Fearfulness of adults or authority figures; or

4. Revelations of highly inappropriate adult behavior,

i.e., being enclosed in a dark closet, forced to drink or eat inedible items.

.       .       .[5]

**Physical Neglect Indicators**

1.     Lack of basic needs (food, clothing, shelter);

2.     Inadequate supervision (unattended);

3.     Lack of essential health care and high incidence of illness;

4.     Poor hygiene on a regular basis;

5.     Inappropriate clothing in inclement weather; or

6.     Abandonment.

**Some Behavioral Indicators of Abuse:**

1.     Wary of adult contact;

2.     Frightened of parents;

3.     Afraid to go home;

4.     Habitually truant or late to school;

5.     Arrives at school early and remains after school later than other students;

6.     Wary of physical contact by adults;

---

[5] Sexual abuse indicators are omitted because they are not relevant in this case.

7.  Shows evidence of overall poor care;

8.  Parents describe child as "difficult" or "bad";

9.  Inappropriately dressed for the weather—no coat or shoes in cold weather or long sleeves and high necklines in hot weather (possibly hiding marks of abuse); or

10. Exhibit behavioral extremes: crying often or never, unusually aggressive or withdrawn and fearful.

**Note:** Behavioral indicators in and of themselves do not prove abuse has occurred. Together with other indicators they may warrant a referral.

Child abuse as defined by the statutes can be inflicted "by any person" and may include student-on-student abuse. These cases also require reporting to CPS, DSHS or law enforcement. Child abuse in this and all other cases requires two elements. First, there must be injury, sexual abuse, sexual exploitation, negligent treatment or maltreatment. Second, there must be harm to the child's health, welfare or safety.

ECF No. 109-2.

**E.    Implementation of child abuse reporting policy and procedure at Chatteroy Elementary School**

Defendant Roberta Kramer was the Riverside School District superintendent during the 2014–15 school year and was in charge of implementing district policies, including District Policy 3421 and Procedure 3421P. ECF No. 171-2 at 5; ECF No. 195 at 3.

Defendant Juanita Murray was the Principal at Chatteroy Elementary School during the 2014–15 school year. She reported directly to Kramer and regularly

discussed implementation of district policy with Kramer. ECF No. 171-1 at 16. Kramer does not recall specifically discussing implementation of the District's child-abuse reporting policy with Murray prior to G.B.'s death. ECF No. 171-2 at 7.

Chatteroy Elementary School has a staff handbook providing guidance to school staff on a number of personnel, policy, conduct, and other issues. ECF No. 135-6. The handbook was developed by the school without input or review by Kramer. ECF No. 171-2 at 5. In the 2014–15 school year, Chatteroy Elementary School's staff handbook addressed reporting of suspected abuse or neglect as follows:

> ANY school personnel who has "reasonable cause" to believe that a child is suffering injuries, suffering physical neglect, or sexual abuse, <u>MUST</u> report this to the CES counselor, first, and then the counselor will then report to the Department of Child Protective Services. ALL CES PERSONNEL MUST BE INVOLVED IN REPORTING. IF A CHILD IS HARMED AND AN EMPLOYEE HAD PREVIOUS KNOWLEDGE THAT ABUSE WAS TAKING PLACE, THE STATE CAN AND WILL TAKE YOUR CREDENTAL.

ECF No. 135-6 at 6. Murray updated the handbook after G.B.'s death to require staff to report suspected abuse directly to DSHS rather than a school counselor. ECF No. 171-1 at 10.

Former school counselor Tiffany Zuck asserts that staff at Chatteroy were encouraged "to read Riverside's official policy as telling staff to report all suspected cases of child abuse, neglect, and exploitation to 'the appropriate school administrator' only—i.e. them—because they didn't want DSHS to get involved."

ECF No. 135-15 at 4. She explains that supervisors implemented a policy of reporting to Murray, who would either call the parent or instruct the employee to call the parent, and then if the problem could not be resolved, would ask Zuck to get involved. *Id.* She also indicates that Principal Murray and Superintendent Kramer established a practice of waiting up to 48 hours to report signs of abuse in order to first attempt to "work it out" with parents. *Id.* at 5. She states she was told by Murray that with regard to personally and immediately reporting suspected abuse at Chatteroy to DSHS, "we don't do that out here." *Id.* at 4. Zuck indicates she believes this policy was implemented by Murray and Kramer because they did not like being confronted by hostile parents. *Id.* at 5.

In deposition testimony, Zuck expresses less certainty about Murray and Kramer's role in setting and implementing the described reporting procedure. She explains that she cannot remember Murray or Kramer directly telling her to report suspected abuse only internally. ECF No. 142-1 at 35–36, 41. Instead, she recalls being told by other teachers and staff that it was the practice to report suspected abuse to Murray only, and that Murray would then decide whether to make a report to DSHS. *Id.* at 36. But she also reaffirms that she believes it was the policy and practice in the school to report only to school administrators and to delay reporting in order to contact parents. *Id.* at 39–40. She states that, in addition to being told that was the practice by other staff and teachers, the practice was implied by the actions

and statements of other employees. *Id.* at 40. She also cites two examples she is aware of where an employee went to Murray with an incident of suspected abuse and Murray contacted the parent or directed the employee to do so rather than report the incident. *Id.*

Before she was involved in this case, on March 13, 2016, Zuck submitted a complaint detailing concerns with Principal Murray's conduct. ECF No. 135-14 at 2–3. She alleged that Murray (1) did not want CPS called regarding students; (2) prevented Zuck from having contact with students who required counseling; (3) prevented implementation of a school-wide behavior plan; and (4) prevented Zuck from working with neglected and abused children, including G.B. *Id.* She also indicated that she had been aware of abuse concerning G.B. and that she was concerned that serious incidents were not being properly reported to DSHS. *Id.* at 9–10. The Northeast Washington Educational Service District investigated these complaints and found insufficient evidence that Murray violated any professional duties. *Id.* at 5.

Several other teachers or staff state or imply that the practice at Chatteroy Elementary School was to report suspected abuse to Murray rather than directly to DSHS. Sherry Dornquast states that the District's official child-abuse reporting policy was not followed at Chatteroy. ECF No. 171-3 at 10. Instead, she states that the policy was "to talk to the counselor and the principal." *Id.* She explains that "I

always went to the principal, and then the counselor would come see me. I always went to [the principal] first because she was our director of ECEAP." *Id.* She further explains that Murray would then decide whether to report to DSHS. *Id.* She also notes that it was Murray's practice to talk to parents about incidents like the ones involving G.B. in the fall of 2014, and she suspects that Murray talked to Khaleel after the incident where G.B. exhibited bruising on his ears and arm in November 2014. *Id.* at 22.

Chatteroy Elementary family services specialist Cheri McQuesten also states that suspected abuse would be reported to Murray, or if she was unavailable, a school counselor, who would then decide whether to contact DSHS. ECF No. 171-7 at 6–8. Chatteroy speech pathologist Sarah Ramsden similarly states that she would call Murray first if she suspected a child was being abused, and indicates she was concerned that if she reported suspected abuse directly to DSHS or law enforcement it "could have jeopardized [her] relationship with Juanita Murray" ECF No. 171-4 at 10–11.

Murray denies that she expected teachers and staff to report suspected abuse to her rather than directly reporting to DSHS. ECF No. 171-1 at 29. But in the only report to DSHS, other than the one regarding G.B., that Murray could remember, a teacher came to Murray with the suspected abuse, and Murray decided to make the report to DSHS. *Id.* at 6. Dornquast also recalls reporting other incidents of suspected

child abuse to Murray. ECF No. 171-3 at 10–11. Additionally, Dornquast came to Murray with each of her concerns about G.B.'s injuries. ECF No. 171-1 at 18–19; ECF No. 171-3 at 19–22.

In this case, numerous signs of abuse and neglect of G.B. were not reported to DSHS or law enforcement. ECF No. 171-1 at 17 (aggression), 20 (bruising on head); 171-3 at 14 (self-harm and aggression), 22 (bruising on ears and arm), 28–29 (burn); ECF No. 171-4 at 14 (self-harm); ECF No. 171-10 at 1–3 (bruises and statements that mother hurt him); ECF No. 171-14 (significant absences).

## C. Procedural History

Plaintiff, G.B.'s grandmother, brought this action against DSHS and the Riverside School District, along with numerous employees of those agencies. ECF No. 1. Her claims against the Riverside Defendants include negligence, violation of G.B.'s substantive due process rights pursuant to § 1983, violation of Washington mandatory reporting laws, and the tort of outrage. In June 2016, the Court denied the Riverside Defendants' motion to dismiss Plaintiff's § 1983 claims against the District, the Directors, and Murray and Kramer, but, with Plaintiff's stipulation, granted the motion to dismiss the § 1983 claims against the other individual Riverside Defendants. ECF No. 99.

## III. LEGAL STANDARD

Summary judgment is appropriate if the "movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322. "When the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citation omitted). When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Sgt. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "In short, what is required to defeat summary judgment is simply evidence 'such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor.'" *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015)).

# IV.   DISCUSSION

The Riverside Defendants' primary argument in favor of summary judgment on Plaintiff's § 1983 claims is the same for the Directors, Superintendent Kramer and Principal Murray, and the District—that Plaintiff fails to establish that the state-created-danger exception to the general rule that a government actor has no constitutional obligation to protect an individual from harm done by a third party applies to permit liability against any Riverside Defendant. The state-created-danger exception applies "when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *Patel*, 648 F.3d at 971–72 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 198–202 (1989); *Grubbs*, 92 F.3d at 900). In its order on the Riverside Defendants' motion to dismiss, the Court concluded Plaintiff's allegations, accepted as true, supported application of the state-created-danger exception. ECF No. 99 at 10–13. Accordingly, the principal question underlying each of the motions now before the Court is whether, viewing the facts in the record in the light most favorable to Plaintiff, a reasonable trier of fact could conclude that the state-created-danger exception applies to permit liability against any of the Riverside Defendants.

Because the answer to that question is yes—material factual questions remain concerning (1) the nature of the child-abuse reporting practices employed at Chatteroy Elementary School; (2) whether such practices affirmatively placed

G.B. in danger; and (3) whether adopting and implementing such practices amounted to deliberate indifference—whether the § 1983 claims against the Directors and Defendants Murray and Kramer should proceed turns on whether those defendants (1) were involved with adopting and implementing the alleged Chatteroy Elementary abuse-reporting policies and practices, or (2) are qualifiedly immune from liability. Whether the § 1983 claims against the School District may proceed turns on whether, in this context, the District is a person capable of being sued under § 1983.

The Directors' only role here was in adopting the district-wide child abuse, neglect, and exploitation policies and practices, which required immediate reporting of suspected abuse, and they had no direct supervisory obligations relating to the implementation of those policies and practices by district staff at individual schools; Plaintiff's § 1983 claims against the Directors must therefore be dismissed. Murray and Kramer, by contrast, were directly responsible for implementing the abuse-reporting practices at Chatteroy Elementary School and they are not immune from liability. Issues of fact preclude summary judgment on the § 1983 claims against Murray and Kramer. Because the alleged harm here was caused by District policy, practice, or custom, or by final policy makers, the District is a proper § 1983 defendant.

**A.      Issues of fact remain concerning whether the child-abuse reporting policy or practice in place at Chatteroy Elementary School affirmatively**

ORDER RE RIVERSIDE DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT- 28

**placed G.B. in danger and was implemented with deliberate indifference to a known or obvious danger.**

As the Court has already explained, ECF No. 99, "[t]o establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Chudacoff*, 649 F.3d at 1149. A government actor generally has no constitutional obligation to protect an individual from harm done by a third party. *See DeShaney*, 489 U.S. at 196–97. There are two exceptions: "(1) when a 'special relationship' exists between the plaintiff and the state (the special-relationship exception), . . . and (2) when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger' (the state-created danger exception)."[6] *Patel*, 648 F.3d at 971–72 (quoting *DeShaney*, 489 U.S. at 198–202; *Grubbs*, 92 F.3d at 900).

The state-created-danger exception applies only where there is (1) "affirmative conduct on the part of the state in placing the plaintiff in danger," and (2) "the state acts with 'deliberate indifference' to a 'known or obvious danger.'" *Patel*, 648 F.3d at 974 (quoting *Munger*, 227 F.3d at 1086; *Grubbs*, 92 F.3d at 900)).

---

[6] It is clear that the special-relationship exception does not apply here. This exception applies where the state "takes a person into its custody and holds him there against his will." *DeShaney*, 489 U.S. at 199–200. Compulsory school attendance is insufficient to create a "special relationship" under the *DeShaney* standard. *Patel*, 648 F.3d at 973.

Deliberate indifference is a very stringent standard:

> Deliberate indifference requires a culpable mental state. The state actor must recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff. In other words, the defendant knows that something *is* going to happen but ignores the risk and exposes the plaintiff to it.

*Patel*, 648 F.3d at 974 (citations and quotation marks omitted). And, as the Court explained in denying the Riverside Defendants' motion to dismiss on this same basis, ECF No. 99, the facts of cases where courts have found deliberate indifference are extreme. *See, e.g.*, *Munger*, 227 F.3d 1082 (police wouldn't allow intoxicated man to drive home or reenter bar and he died of hypothermia from minus 20 to 25 degree temperatures); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (man died after police officers found him on his porch in need of medical attention and cancelled a paramedic call, moved him inside, and left); *Grubbs*, 974 F.2d 119 (RN who worked in a state prison was raped when she was put in a situation where she was working alone with a violent sex offender.); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) (officer arrested driver of a vehicle for DUI and left passenger alone in a known dangerous location, where she was then raped).

The Court previously concluded that the alleged facts here were severe enough to demonstrate affirmative action and deliberate indifference. The Court explained:

> A five-year-old boy had serious bruises on his head (and a history of

signs of abuse) and told his teacher that his mother punched him. Rather than report this to DSHS, *or the police*, immediately, the employees apparently followed policy and waited to report the incident to school officials who were absent that day. As a result, the child was beaten to death.

Based on the facts as alleged, it is plausible that Riverside policy makers and employees knew that these policies in general would result in children being harmed, and it is likely that employees knew that in this case G.B. would suffer harm if they followed established policy and custom and did not immediately report the signs of abuse. They likely did not know G.B. would be killed, but it is certainly probable that they knew he would be harmed.

No. 99 at 12–13.

On the factual record now before the Court, material factual questions remain concerning (1) the nature of the child-abuse reporting practices employed at Chatteroy Elementary School, including whether staff were required to report suspected abuse only to designated staff or administrators and whether staff were encouraged to delay or avoid reporting suspected abuse; (2) whether such practices affirmatively placed G.B. in danger; and (3) whether adopting and implementing such practices amounted to deliberate indifference.

Tiffany Zuck asserts that Murray and Kramer encouraged staff "to read Riverside's official policy as telling staff to report all suspected cases of child abuse, neglect, and exploitation to 'the appropriate school administrator' only—i.e. them—because they didn't want DSHS to get involved.'" ECF No. 135-15 at 4. She also indicates that Murray and Kramer established a practice of delaying reporting signs

of abuse in order to first contact parents and attempt to "work it out." *Id.* at 5. Zuck also states that she was told by Murray that with regard to personally and immediately reporting suspected abuse at Chatteroy to DSHS, "we don't do that out here." *Id.* at 4. Zuck believes this policy was implemented by Murray and Kramer because they did not like being confronted by hostile parents. *Id.* at 5.

As discussed, infra, the practices Zuck describes are inconsistent with the Riverside School District child abuse, neglect, and exploitation policy and procedure adopted by the Directors, but her assertions are partially corroborated by the Chatteroy Elementary School Staff Handbook, which provides, as relevant here:

> ANY school personnel who has "reasonable cause" to believe that a child is suffering injuries, suffering physical neglect, or sexual abuse, <u>MUST</u> report this *to the CES counselor, first*, and then the counselor will then report to the Department of Child Protective Services.

ECF No. 135-6 at 6 (emphasis added). Zuck's allegations are further supported by the fact that Murray updated the School's handbook after G.B.'s death to require reporting suspected abuse directly to DSHS. ECF No. 171-1 at 10. Moreover, Zuck is not the only staff person who stated or implied that a policy of reporting directly to Murray existed at Chatteroy Elementary School. Sherry Dornquast, Cheri McQuesten, and Sarah Ramsden each made statements indicating that staff were expected to report suspected abuse to Murray rather than going directly to DSHS or law enforcement. ECF No. 171-3 at 10; ECF No. 171-4 at 10–11; ECF No. 171-7 at 7–8. Further, the fact that numerous signs that G.B. was being abused went

unreported also supports the assertion that a practice of avoiding and delaying reporting to DSHS or law enforcement was in place at the school. And these assertions are consistent with Murray's description of how reporting occurred in an incident involving another child in 2014–15, ECF No. 171-1 at 6, and with the actions of teachers and staff after observing G.B.'s injuries. ECF No. 171-1 at 18–19.

This evidence, viewed in the light most favorable to Plaintiff, would permit a reasonable fact finder to conclude that the child-abuse reporting practice at Chatteroy Elementary School affirmatively placed G.B. in danger and that the practice was adopted and implemented with deliberate indifference to a known or obvious risk of danger.

**B. The record does not support § 1983 liability against the Directors.**

Plaintiff's claims against the Directors and District appear to be based solely on the Directors' policymaking and oversight actions, not on any action specifically related to G.B. None of the Directors had any personal knowledge or awareness of suspected abuse, neglect, or exploitation of G.B. at Chattaroy Elementary School.[7]

---

[7] Nieuwenhuis did receive an email from Khaleel expressing concerns about how she and her children were being treated by the District and Khaleel attended a December 2014 board meeting where she expressed these concerns. Superintendent Kramer also stated to Nieuwenhuis that she was concerned for the Khaleel family. ECF No. 149 at 3–4, 7–8. But Plaintiff's § 1983 claims against the Directors are not predicated on these facts.

ECF No. 149 at 3.

The Directors argue that Plaintiff fails to identify any constitutional right that was violated by a policy the Directors adopted. ECF No. 105 at 6. Plaintiff asserts that policies and customs adopted by the Directors, as well as failure of oversight and training, deprived G.B. of his right to substantive due process under a state-created-danger theory of § 1983 liability. ECF No. 133 at 10–11. As discussed, issues of fact remain regarding the nature of the child abuse reporting practices at Chatteroy Elementary School, whether the practices affirmatively placed G.B. in danger, and whether the practices were adopted with deliberate indifference to a known or obvious danger. But even accepting Plaintiff's description of the practices at Chatteroy, the practices plainly are inconsistent with the district-wide child abuse, neglect, and exploitation procedure adopted by the board of directors. That procedure, as relevant here, provides:

> When there is reasonable cause to believe that a student has suffered abuse or neglect, staff or the principal will *immediately contact the nearest office of the Child Protective Services (CPS) of the Department of Social and Health Services (DSHS)*. If this agency cannot be reached, the report will be submitted to the police, sheriff, or prosecutor's office. Such contact must be made within forty-eight (48) hours. Staff will also advice the principal regarding instances of suspected abuse or neglect and reports of suspected abuse that have been made to state authorities or law enforcement. In his/her absence the report will be made to the nurse or counselor.

ECF No. 109-1 at 1 (emphasis added).

Viewing the facts in the light most favorable to Plaintiff, G.B.

demonstrated obvious and serious signs of abuse that clearly supported reasonable cause to believe he had suffered abuse. Under Procedure 3421P, staff or Murray were therefore obligated to contact DSHS or law enforcement *immediately*. That did not happen here, instead, school staff and officials delayed reporting or failed to report G.B.'s signs of abuse, and on April 16, 2015, when G.B. said his mom punched him and both Murray and Zuck were unavailable, no report was made to DSHS. While District procedure may not prohibit having a designated official report suspected abuse to DSHS, the procedure clearly does not permit delay in reporting because such an official is unavailable.

The problem with Plaintiff's claim against the Directors is that the Directors' role here was limited to adopting the district-wide child abuse, neglect, and exploitation policies and procedures. And Plaintiff has provided no basis to conclude that the Directors, in adopting those policies and procedures, were deliberately indifferent to a known and obvious danger to G.B. or other students. Indeed, as discussed, Procedure 3421P *requires* the reporting Plaintiff argues should have occurred here. Further the District's child abuse, neglect, and exploitation policies and procedures provide a clear and expansive definition of child abuse, specific examples of signs of abuse, and clear reporting requirements and procedures. ECF Nos. 109-1 & 109-2. And those policies and procedures are identical to WSSDA's

model child abuse, neglect, and exploitation policies, which presumably have been adopted by many other districts throughout the state. The possible constitutional violation by the District or its staff, as alleged by Plaintiff, occurred because the Procedure 3421P *was not* followed. No authority supports Plaintiff's argument that the Directors are liable for District staff or officials' allegedly unreasonable interpretation or implementation its policy.

Plaintiff also argues that the Directors failed to provide meaningful supervision or oversight and failed to provide adequate training to district employees. ECF No. 133 at 14–19. "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Henry A. v. Willden*, 678 F.3d 991, 1004 (9th Cir. 2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011)) (internal quotation marks omitted). A policy of inadequate training is also actionable under § 1983. *Bergquist v. Cty. of Cochise*, 806 F.2d 1364, 1371 (1986). But the Directors are not supervisors and have no obligation to supervise implementation of policies at individual schools. Under Washington law, a school district board of directors is "vested with the final responsibility for the setting of policies ensuring quality in the content and extent of its educational program and that such program provide students with the opportunity

to achieve those skills which are generally recognized as requisite to learning." Wash. Rev. Code (RCW) § 28A.150.230(1). But school boards may, and generally do, hire a superintendent and other administrators and delegate administrative authority to those officials. RCW § 28A.330.100; ECF No. 143 at 9–10. School boards are generally not equipped to provide administrative supervision of superintendents or to provide oversight of the details of specific policy implementation at individual schools. ECF No. 143 at 10. Additionally, Plaintiff fails to provide any facts supporting the allegation that the Directors adopted a policy that caused a failure to train or supervise.

## C. Issues of fact preclude summary judgment on the claims against Cramer and Murray.

Defendants Kramer and Murray argue that Plaintiff fails to state a § 1983 claim against them because no exception to the rule that a government actor has no constitutional obligation to protect an individual from harm by a third party applies to them and, in the alternative, because they are entitled to qualified immunity. ECF No. 151 at 4–5. As discussed, material disputed issues of fact remain concerning (1) the nature of the child-abuse reporting practices employed at Chatteroy Elementary School, including whether staff were required to report suspected abuse only to designated staff or administrators and whether staff were encouraged to delay or avoid reporting suspected abuse; (2) whether such practices affirmatively placed G.B. in danger; and (3) whether adopting and implementing such practices amounted

to deliberate indifference. And there is little question that Kramer and Murray were responsible for adopting and implementing whatever practices were in place at Chatteroy Elementary School. Issues of fact therefore remain concerning whether their actions affirmatively placed G.B. at risk of harm and amounted to deliberate indifference to a known or obvious risk of danger. And because issues of fact preclude summary judgment on the basis that Kramer and Murray had no obligation to protect G.B. from harm by a third party, the same factual questions preclude qualified immunity at this stage.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)). To determine whether an official is entitled to qualified immunity, courts generally apply a two-part inquiry: "First, do the facts the plaintiff alleges show a violation of a constitutional right? Second, was the right 'clearly established' at the time of the alleged misconduct." *Carrillo v. Cty. of L.A.*, 798 F.3d 1210, 1218 (9th Cir. 2015) (citations omitted). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or

constitutional question beyond debate." *Id.* (quoting *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)).

As discussed, issues of fact remain concerning whether Kramer and Murray were deliberately indifferent to the a known or obvious risk of danger—that children would be abused—by implementing a policy of encouraging reporting suspected abuse internally and unnecessarily delaying reporting to DSHS or law enforcement. Acting with deliberate indifference to such a known or obvious harm violates clearly established federal law. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1066 (9th Cir. 2006) (holding that it is clearly established law for the purpose of qualified immunity that state officials can be held liable for affirmatively and with deliberate indifference placing an individual in danger she would not otherwise have faced.)

**D.    The Riverside School District is a proper defendant under § 1983.**

The School District argues that Plaintiff fails to establish a § 1983 claim against it because (1) no exception to the rule that a government actor has no constitutional obligation to protect an individual from harm by a third party applies to it and, (2) because Plaintiff fails to establish liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). ECF No. 157 at 4–6. As discussed, material issues of fact preclude summary judgment on the first basis. As to the second, if there is § 1983 liability for harm caused by the individual Riverside Defendants, the

School District may also be held liable because the allegedly unlawful actions involve implementing a District policy or custom and the actions of final policymakers—Murray and Kramer.

"[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. Instead, a municipality is responsible for its officials' unconstitutional conduct under § 1983 only if the conduct was caused by a municipal policy, practice, or custom. *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). A plaintiff may establish a municipal policy, practice, or custom in one of three ways: (1) "the plaintiff may prove that a [municipal] employee committed the alleged constitutional violation pursuant to a formal government policy or a longstanding practice or custom which constitutes the standard operating procedure of the [city]"; (2) the plaintiff may show "that the individual who committed the constitutional tort was an official with final policy-making authority"; or (3) "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Hooper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001).

In this case Plaintiff's claims clearly implicate school district policy, practice, or custom, and the actions of final policymakers. And, as discussed, disputed issues of material fact preclude summary judgment on those claims.

**E.    Motions to Strike Declarations of Tiffany Zuck and Lisa Chan**

**1.    Declaration of Tiffany Zuck**

In their reply in support of their motion for summary judgment on Plaintiff's claims against the Directors, the Riverside Defendants move to strike specific portions of the Declaration of Tiffany Zuck. ECF No. 140 at 9–10. The Directors argue that Zuck's declaration contains inadmissible opinions and hearsay and lacks foundation. *Id.* at 9. The Directors also argue that. Zuck's declaration is contradicted by her deposition testimony. *Id.* at 9.

In her deposition, Zuck qualifies or arguably changes her understanding of state law regarding child abuse reporting, and whether practices she observed violated RCW § 26.44.030. ECF No.142-1 at 11–14, 19–25. But Zuck's interpretation of state law is irrelevant here. What matters is her factual account of the child-abuse reporting procedures at Chatteroy Elementary School.

Zuck's deposition testimony does contradict some aspects of her declaration on these facts. Most importantly, Zuck expresses less certainty about Murray and Kramer's role in setting and implementing the described child-abuse reporting procedure at Chatteroy Elementary School. She explained that Murray and Kramer did not directly tell her to report suspected abuse only internally. ECF No. 142-1 at 35–36. Instead, she recalls being told by other teachers and staff that that it was the practice to report suspected abuse to Murray only, and that Murray would then

decide whether to make a report to DSHS. *Id.* at 36. She also acknowledges incorrectly stating that ECEAP employees at Chatteroy did not receive training on child-abuse reporting, clarifying that she was not aware whether employees other than herself did not receive training. *Id.* at 15–18. Zuck also said she couldn't remember being told at new-employee training that she was only to report suspected abuse or neglect to administrators. *Id.* at 35–36.

But Zuck's testimony also reaffirms much of her declaration. She makes clear that she believed it was the policy and practice in the school to report only to school administrators and to delay reporting in order to contact parents. *Id.* at 39–40. She states that, in addition to being told that was the practice by other staff and teachers, the policy was implied by the actions and statements of other employees. *Id.* at 40. She also cites two examples she was aware of where an employee went to Murray with an incident of suspected abuse and Murray contacted the parent or directed the employee to do so rather than report the incident. *Id.* at 40.

The Riverside Defendants cite no authority for the position that inconsistent testimony is a basis to strike a declaration. Instead, they appear to infer that position from the uncontroversial principle that inconsistent statements by a plaintiff alone do not create an issue of fact, *see Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543–44 (9th Cir.1975) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting

his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). But there is no logical basis for extending that principle to strike the portion of inconsistent statements that one party would prefer not to have in the record.

In any case, the inconsistencies between Zuck's declaration and deposition testimony are not sufficient to discount her declaration. As noted, she reaffirms her general view of the factual circumstances and abuse-reporting practice at Chatteroy in her deposition. Moreover, Zuck's assertions in her declaration are consistent with the testimony of several other Chatteroy Elementary School teachers and staff, who also indicated that staff were expected to report suspected abuse to Murray rather than going directly to DSHS or law enforcement.

On the question of admissibility, the bulk of Zuck's statements are based on personal knowledge, and the statements of others she references are primarily by defendants in this case. Additionally, Plaintiff has adequately demonstrated a foundation for Zuck's personal knowledge about child-abuse reporting practices at Chatteroy Elementary. The relevant portions of Zuck's declaration are admissible and may be considered on summary judgment.

The Riverside Defendants' motion to strike the Declaration of Tiffany Zuck is denied.

### 2.     Declarations of Lisa Chan and Dr. Ronald Stephens

In their reply in support of their motion to dismiss the § 1983 claims against the District, the Riverside Defendants move to strike the declarations of Lisa Chan and Dr. Ronald Stephens, which Plaintiff submitted in response to the Riverside Defendants' motion. ECF No.196 at 2–3. The Riverside Defendants argue that the statements in Chan's declaration are inadmissible and misleading, ECF No. 209 at 1–2, and that Dr. Stephen's declaration is irrelevant, ECF No. 196 at 3.

As with Zuck, the Riverside Defendants point to inconsistencies between Chan's declaration and her deposition testimony to support their argument that her declaration is misleading. ECF No. 209 at 2–5. And as with Zuck, her statements are based on personal knowledge as an employee at Chatteroy Elementary School and most of the statements of others she references appear to be by defendants in this case.

With respect to the declaration of Dr. Stephens, his statements regarding proper school district child-abuse reporting policy implementation and training are plainly relevant, and will not be stricken.

The Riverside Defendants' motion to strike the declarations of Lisa Chan and Dr. Ronald Stephens is denied.

### CONCLUSION

For the reasons discussed, **IT IS HEREBY ORDERED**:

1.    The Riverside Defendants' Motion for Summary Judgment to Dismiss Board of Directors, **ECF No. 105**, is **GRANTED IN PART AND DENIED IN PART** as follows:

*A.*    Plaintiff's § 1983 claims against the Directors are **DISMISSED**;

*B.*    The Riverside Defendant's motion for summary judgment with respect to Plaintiff's state-law claims against the Directors is **DENIED**.

2.    The Riverside Defendants' Motion for Summary Judgment to Dismiss Defendants Murray and Kramer, **ECF No. 151**, is **DENIED**.

3.    The Riverside Defendants' Motion for Summary Judgment to Dismiss Riverside School District No. 416, **ECF No. 157**, is **DENIED**.

4.    The Riverside Defendants' Motion to Strike the Declaration of Tiffany Zuck is **DENIED**.

5.    The Riverside Defendants' Motion to Strike the Declarations of Lisa Chan and Dr. Ronald Stephens is **DENIED**.

**IT IS SO ORDERED.**  The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 16th day of January 2018.

_____
SALVADOR MENDOZA, JR.
United States District Judge

ORDER RE RIVERSIDE DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT- 45